291 So.2d 887 (1974)
In re The GULF OXYGEN-WELDERS SUPPLY PROFIT SHARING PLAN AND TRUST AGREEMENT, Plaintiff-Appellant.
No. 4435.
Court of Appeal of Louisiana, Third Circuit.
March 25, 1974.
Camp, Carmouche, Palmer, Carwile & Barsh, by H. Gayle Marshall and Edwin K. Hunter, Lake Charles, for plaintiff-appellant.
Before FRUGE, DOMENGEAUX and WATSON, JJ.
WATSON, Judge.
The Calcasieu-Marine National Bank of Lake Charles, trustee of the Gulf Oxygen-Welders Supply Profit Sharing Plan and Trust Agreement, applied to the district court of Calcasieu Parish for instructions pursuant to LSA-R.S. 9:2233(B). The trustee sought authoritative instructions as to the proper disposition of certain trust funds. The district court dismissed the petition of the trustee for lack of jurisdiction, by holding that LSA-R.S. 9:2233(B) is unconstitutional.
The district court said in its judgment:
"Louisiana Revised Statutes 9:2233(B). . . contravenes Article II and Article VII of the Constitution of the State of Louisiana insofar as that statute appears *888 to authorize the rendition of advisory opinions to trustees by Louisiana Courts;" (TR. 51).
From the adverse judgment, the trustee has appealed to this court. However, this court does not have appellate jurisdiction of the case in its present posture since the Louisiana Supreme Court has exclusive appellate jurisdiction over cases in which a law of this state has been declared unconstitutional. Article VII, Section 10(2), Louisiana Constitution.
For the above and foregoing reasons it is ordered that this case be transferred to the Supreme Court, the transfer to be made within sixty days after this decree has become final; otherwise the appeal is to be dismissed. The appellant is to pay all costs of this appeal and the costs of transferring the case to the Supreme Court. LSA-C.C.P. art. 2162; LSA-R.S. 13:4441-4442; Acosta v. Board of Commissioners of Lake Borgne Basin Levee District, 201 So.2d 19 (La.App. 4 Cir. 1967); affirmed 251 La. 789, 206 So.2d 496 (1968); Stream v. Louisiana State Collector of Revenue, 288 So.2d 926 (La. App. 1 Cir. 1973).
Appeal transferred to the Supreme Court of Louisiana.
Fruge, J., concurred with written reasons.
FRUGE, Judge (concurring).
Insofar as the majority has held that this court lacks jurisdiction, I concur. However, I believe the lower court's determination of the unconstitutionality of this statute, on its own motion, to have been hasty and improper, in view of the relative importance of trusts and trust procedure to our law. In order to express my sentiments and aid in the expeditious review of this matter, I have included the following opinion, which I feel to be appropriate in the instant case.
It is a fundamental of our law that legislative acts are presumed constitutional at the time of their enactment. Louisiana & Arkansas Railway Company v. Goslin, 258 La. 530, 246 So.2d 852 (1971). Had a party to this proceeding questioned the constitutionality of LSA-R.S. 9:2233(B), that party would have borne the burden of proving the statute invalid, Louisiana & Arkansas Railway Company, supra. Under our jurisprudence, if a court is to declare a legislative act unconstitutional, it is necessary the court find that "no fair reason supports the legislative judgment." Hamilton v. McKeithen, 254 La. 683, 226 So.2d 494, 502 (1969).
I find in point the following expression by our own Supreme Court in State v. Guidry, 247 La. 631, 173 So.2d 192, 193 (1965):
". . . the Legislature exercises the entire legislative power of the state, except in so far as some limitation has been imposed by the state Constitution, and that, therefore, for successfully assailing the constitutionality of any statute, it is necessary to point out some particular provisions of the Constitution which has taken away from the Legislature the power to pass it."
Further corroborative of the constitutionality of this statute is the case of St. Charles Land Trust, Achille Guibet v. St. Amant, 253 La. 243, 217 So.2d 385 (1968), in which trustees applied to a district court for instructions pursuant to La.R.S. 9:2233. The trustees sought authority to transfer a deceased beneficiary's interest in a trust under the provisions of a California court order. The Supreme Court gave the requested instructions and cited the statute in question without any apparent reservations as to its constitutionality. In the case of Hughes v. Burguieres, 276 So.2d 267 (1973), our Supreme Court again seemed to have no qualms as to the validity of this statute, as it footnoted the herein-concerned statute as being an applicable procedural provision.
*889 In Scott on Trusts, § 259, p. 2214, the rational basis for this type of trust provision is stated as follows:
". . .. The trustee is entitled to the instructions of the court as to the extent of his powers and duties, as to who are beneficiaries under the trust, and as to the extent of trust interest.. . .and as to the persons who are entitled to the trust property on the termination of the trust."
The procedure established under our statute was meant to aid fiduciaries in the interpretation of trust instruments. This provision seems to follow that of most other states in regard to trust law. Through this statute, the redactors of the Louisiana Trust Code of 1964 provided an additional mode of procedure for trustees to obtain court guidance without charging the trustee with the expenses of locating and serving each and every beneficiary and/or settlor.
From the foregoing, I conclude that it was error for the district court to declare LSA-R.S. 9:2233(B) unconstitutional, inasmuch as there was a rational purpose for the adoption of the statute and its unconstitutionality is not manifest.
I now consider the instructions requested and the issues presented thereby. On August 22, 1966, the following companies enacted the profit sharing plan and trust agreement aforenamed (hereinafter referred to as the plan) to benefit the employees of said companies.
(1) Gulf Oxygen Company Inc.
(2) Welders Supply Co. of Baton Rouge, Inc.
(3) Welders Supply Co. of Houma, Inc.
(4) Welders Supply Co. of Lake Charles, Inc.
(5) Welders Supply Co. of Morgan City, Inc.
(6) Welders Supply Co. of Shreveport, Inc.
(7) Welders Supply Co., Inc.
(8) Welders Supply Co. of Eunice, Inc.
(9) Welders Supply Co. of Harvey, Inc.
(10) Earl H. Hines and Sons Realty Company, Inc.
On December 19, 1972, all the companies then participating in the plan agreed to its termination. As a consequence of the agreement to terminate, the trustee requested a determination from the Internal Revenue Service as to the effect of the termination of each company's participation in the plan. A favorable determination was received by all companies except Welders Supply Company of Baton Rouge, Inc. (hereinafter referred to as "the Company").
For the calendar year 1970, the Company made no contributions to the trust agreement because of negligible profits during that year. The Company did made contributions to the trust agreement in 1969, 1971, and 1972. At the beginning of the 1970 calendar year, Ural Canady, Paul Collard, Lonnie C. Cowart, and Bert A. Dale were employed by the Company. These employees had been allocated certain benefits from the Company's contributions to the plan in accordance with § 6.1 of its provisions, as follows: "Canady, $4,681.85; Collard, $243.16; Cowart, $1,347.54; Dale, $2,286.79."
Messrs. Canady, Collard, and Dale resigned from the Company during the 1970 calendar year. On their resignation, they were each paid the amount of their respective allocations which were considered vested in accordance with Article 9 of the plan. The remaining portions (these being the portions previously allocated but not vested in the resigning participants) were forfeited by them in the following amounts: Canady, $3,979.57; Collard, $243.16; Dale, $2,058.11. During the same year, additional persons were employed by *890 the Company to replace those who had resigned, these being Earl Hines, Sr., John D. Hines, and Rod Orgeron.
The forfeitures above-described were allocated per instructions of the trust agreement's trust advisory committee at the end of the 1970 calendar year. The allocations were made in conjunction with the participation of Mr. Cowart, whose employment had never terminated, and on the assumption that the three aforenamed new employees were valid participants. Inasmuch as the allocations were based upon both salary and service units (see §§ 6.1 and 7.4 of the trust), the forfeitures were allocated in the following manner:

 SALARY SERVICE AMOUNT ALLOCATED PERCENTAGE OF
 EMPLOYEE UNITS UNITS FROM FORFEITURES TOTAL FORFEITURES
1. Lonnie C. Cowart 56 5 2,016.49 32.1%
2. Earl Hines, Sr. 4 26 991.71 15.78%
3. John D. Hines 4 16 661.14 10.53%
4. Rod Orgeron 77 2 2,611.50 41.58%
 _________ ________
 TOTAL FORFEITURES ALLOCATED 6,280.84 100%

Trustee's counsel believed the allocation of forfeitures, as previously described, proper in view of the actual trust provisions. However, the pension division of the Internal Revenue Service advised the trustee that the forfeitures were improperly allocated for the calendar year 1970.
In the opinion of the Internal Revenue Service, the trust agreement terminated during the year 1970 when the three aforenamed employees left the employer. It was their belief that the funds involved should have been 100% vested in these three employees and distributed to them at that time; and that the failure to do so produced the discrimination prohibited by § 401(a)(4) of the Internal Revenue Code. These latter participants were also asserted to have received 68% of the forfeitures in 1970, the receipt thereof allegedly constituting a discriminatory allocation in violation of 26 U.S.C.A. § 401 et seq.
Instructions requested by the trustee from the district court involved a determination of the following matters:
1. Was the Company's participation in the trust agreement terminated in the year 1970?;
2. Were Messrs. Orgeron, Hines, and Hines, Sr., valid participants in the trust as it applied to the Company?;
3. Were the forfeitures occasioned in 1970 properly allocated in accordance with the trust agreement provisions?
Under the clear provisions of § 4.5 of the plan:
". . .no company shall be obligated to make any contributions in the plan for any fiscal year until all losses from the "operation of the company for any preceding year or years shall have been offset by equivalent net profits. In the event the company incurs a deficit or deficits, it shall be under no obligation to the plan, and any such accumulated deficit shall be offset by equivalent net profits, as the same shall be determined by the application of generally accepted accounting principles, before the company shall be in any way obligated to make or approve the contributions to the plan."
Under § 8.1:
"The termination of employment, retirement, or death of a Participant shall terminate his participation in the plan, and except as the benefits payable hereunder in such event are within the exception provided hereinafter, such Participants shall have no further right, title, or interest in this plan or in the fund."
*891 § 8.2 provides:
"The value of the account of a participant whose employment has been terminated, or who shall retire or die, shall be the value thereof as of the last anniversary date preceding such event."
Article IX provides for the determination of a participant's "vested interest" in the amount then credited to his account. This interest is based upon the completion of a predetermined number of years of participation in the plan under § 9.2.
Under § 16.4, it is provided that:
"Upon termination or discontinuance of the plan, or upon complete discontinuance of contributions to the plan, the amount credited to the participant's account shall be considered fully vested and nonforfeitable . . ."
In regard to a participant's forfeitures is § 7.4, which provides:
"Any forfeiture occasioned by a termination of employment prior to full vesting "shall be reallocated to the remaining participants in the plan. All forfeitures during the twelve months preceding any anniversary date shall be reallocated to the participants on that anniversary date in the same manner and on the same basis in which any contribution by the company as of that date shall be allocated."
Under the aforesaid sections, Mr. Canady was vested with 15% of the benefits contributed to his account under the plan. Mr. Collard had no vested interest, and Mr. Dale had a 10% vested interest. Under § 4.5 aforementioned, it is evident that there was no requirement to contribute where there existed negligible profits for the year. Therefore, the failure to contribute during the year 1970 would not have, in and of itself, caused the termination of the trust agreement. Regarding termination, under the provisions of § 16.4 hereinbefore quoted, we do not feel that the failure to contribute during the year 1970 can be considered a "complete discontinuance of contributions. . . ."in light of the fact that contributions were made in the years 1971 and 1972, prior to the entire plan's termination.
Federal jurisprudence makes it manifest that the fact that a trust was once qualified under the provisions of 26 U.S.C.A. § 401, does not mean the trust can not lose such qualification by becoming discriminatory in operation. Under § 401(a)(4), it is specifically provided that the requirements for qualification under this section are not fulfilled:
"If the contributions or benefits provided under the plan discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist of supervising the work of other employees, or are highly compensated employees."
In certain cases plans have been deemed discriminatory wherein lower paid employees gradually withdrew, thereby causing the prohibited discrimination in operation of the profit sharing agreement. In the instant case, however, I am unable to find of record any indication that the result produced in this case occurred for any reason other than the sudden resignation of the formerly denominated employees.
It appears that interests were vested directly in accordance with the provision of the plan, and that the remaining forfeitures were likewise allocated in strict conformity with the trust provisions. The ultimate distribution of these funds to the new participants was in good faith and should not be deemed in violation of the discrimination provision of § 401 of the Internal Revenue Code. In the case of Commissioner of Internal Revenue v. Sherwood Swan and Company, 352 F.2d 306 (9th Cir. 1965), the Tax Court and the Ninth Circuit upheld a profit sharing plan that gave executives an increasingly larger share of the total amount contributed by the employer and earned by the fund, as other employees forfeited their shares by leaving their employ.
*892 The disproportion in forfeitures allocated resulted from the sudden resignation of a relatively large number of higher paid Baton Rouge Company employees in 1970. I do not feel that the forfeiture allocations, as determined by trustee's counsel in regard to this specific employment situation, created the discrimination envisioned and prohibited by 26 U.S.C.A. § 401(a)(4). Therefore, I deem the manner of distribution of the forfeited funds by the trustee to have been conducted in the proper and required manner under the applicable provisions of the plan.
For the above and foregoing reasons, I would give the following instructions:
(1) The Baton Rouge Company's participation in the trust was not terminated in the year 1970;
(2) The participation in the trust, as it applied to the Baton Rouge Company by Messrs. Orgeron, Hines, and Hines, Sr., was valid; and
(3) The forfeitures occasioned in 1970 were properly allocated in accordance with the provisions of the trust agreement.